INDEPENDENT DISTRIBUTORS
COOPERATIVE USA,
Plaintiff,

v.

ADVANCED INSURANCE BROKER-
AGE OF AMERICA, INC., d/b/a Ad-
vanced Insurance Administration, De-
fendant.

No. IP 01–0737–C–B/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 29, 2003.

James R Fisher, Ice Miller, Indianapolis, IN, for Plaintiff.

Pat Henry, Little Rock, AR, pro se.

Thomas E Satrom, Locke Reynolds LLP, Indianapolis, IN, for Defendant.

## ENTRY DENYING DEFENDANT'S MOTION TO DISMISS

BARKER, District Judge.

This matter comes before the court on Defendant Advanced Insurance Brokerage

of America, Inc.'s Motion for Summary Judgment, or in the alternative, to Dismiss. Plaintiff Independent Distributors Cooperative–USA filed suit against Defendant alleging Indiana state law claims of fraud and breach of contract. Defendant argues that Plaintiff's claims are preempted by ERISA and that they are without merit because they are based on contract provisions or facts that do not exist. In the alternative, Defendant moves to dismiss Plaintiff's complaint for failure to state a claim upon which relief may be granted. After filing this motion, Defendant filed an additional and interrelated Motion for Summary Judgment, which only recently was fully briefed by the parties. Therefore, in this entry, we address only Defendant's arguments in favor of dismissal, namely, that Plaintiff's claims are preempted by ERISA and that Plaintiff has failed to state a claim upon which relief may be granted, and reserve for a later date consideration of Defendant's other grounds for summary relief. For the reasons set forth below, we conclude that Plaintiff's claims are not preempted by ERISA, and we *DENY* Defendant's Motion to Dismiss.

## Factual Background [1]

Plaintiff, Independent Distributors Cooperative USA ("IDC"), an Indiana corporation, is a cooperative comprised of independent entities in the industrial supply business. Compl. ¶¶ 1, 8. IDC was the plan administrator and plan sponsor of an employee welfare benefit plan ("the Plan"), which became effective January 1, 1996. Compl., Ex. A, § 6.A; *see also* ERISA §§ 3(16)(A)-(B) (defining the terms plan administrator and plan sponsor). IDC terminated the Plan on December 31, 1997. An October 1997 audit of the Plan revealed that a funding shortfall had rendered the Plan financially untenable, in part because IDC did not have the resources to maintain the Plan as a Multiple Employer Welfare Arrangement ("MEWA"). Pl.'s Resp. to Def.'s Mot. for Summ. J., or in the alternative, to Dismiss at 3–4. Because Defendant, Advanced Insurance Brokerage of America, Inc. ("AIA"), does not argue in its Motion to Dismiss that the Plan is not an MEWA, we assume for purposes of AIA's motion that the Plan is an MEWA. Compl. ¶ 21; Ex. A.[2]

IDC retained Pat Henry ("Henry"), a citizen of Arkansas, to assist IDC in locating and employing a qualified expert to design a workable group health insurance plan for IDC's member companies. Compl. ¶¶ 2, 10. Henry identified AIA, an Arkansas corporation, as an expert in designing appropriate group health insurance plans for business entities. *Id.* ¶¶ 3, 14. AIA agreed to develop a group health insurance program for IDC. *Id.* ¶ 15. On October 20, 1995, Henry presented the benefits of AIA's proposed plan to IDC. *Id.* ¶¶ 2, 18. IDC argues that Henry was "a paid agent and salesman for AIA" when he made this presentation to IDC, a char-

---

1. Because this case is before the court on Defendant's motion to dismiss, we treat all well-pleaded factual allegations as true, and we construe all inferences that reasonably may be drawn from those facts in a light most favorable to the nonmoving party, IDC. Fed. R.Civ.P. 12(b)(6); *Szumny v. Am. Gen. Fin.*, 246 F.3d 1065, 1067 (7th Cir.2001).

2. An MEWA is defined, with three exceptions not relevant here, as "an employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan) which is established or maintained for the purpose of offering or providing ... [welfare plan benefits] to the employees of two or more employers." ERISA § 3(40)(A). Within the parameters set forth by ERISA § 514(b)(6)(A), states may apply and enforce their State insurance laws with respect to MEWAs. Compl. ¶ 22; *Pension & Welfare Benefits Admin., Multiple Employer Welfare Arrangements under ERISA: A Guide to Federal and State Regulation* at *16 (Oct. 29, 2002).

acterization that AIA vigorously disputes. *Id.* ¶ 23; Answer ¶ 23. IDC alleges further that Henry and AIA knew or should have known that the plan they proposed was an MEWA and as such was infeasible for IDC and its members. Henry, however, informed IDC that AIA had confirmed to him that the proposed plan was not an MEWA, and therefore, that it would not be subject to any of the state regulations applicable to MEWAs, based on the opinion of the attorneys for the reinsurer that AIA had selected to provide stop loss coverage for the proposed plan. Compl. ¶¶ 19–23. In fact, apparently no such legal opinion was ever rendered. Compl. ¶¶ 24–25. Relying on Henry's allegedly fraudulent representations as a representative of AIA, IDC adopted the proposed plan on January 26, 1996. Compl. ¶¶ 26–28.

On January 16, 1996, IDC and AIA entered into an Administrative Services Agreement ("1996 Agreement"). Compl. ¶ 32.[3] Section 1.A.1 of the 1996 Agreement provides, in relevant part: "The Administrator [AIA] shall provide I.D.C. with the following services as required for the administration and operation of the Plan.... A. 1. Recommendations as to initial development and design of the Plan and Plan Document and further revisions thereof." IDC alleges that AIA's recommended design, in which the Plan qualified as an MEWA, constituted a breach of contract.

From the time of the Plan's initial implementation, IDC contends that the Plan as designed by AIA was never in compliance with all applicable state and federal laws and regulations governing MEWAs. Compl. ¶ 36. Prior to renewal of the 1996 Agreement, the reinsurer informed AIA that it believed the Plan was, in fact, an MEWA, and subsequently, it declined to renew the stop loss insurance for the Plan because it was unwilling to provide coverage for what it perceived to be an unlawful plan. *Id.* ¶ 42. AIA did not inform IDC that the reinsurer believed that the Plan was an MEWA. *Id.* ¶ 43. IDC alleges that AIA's withholding of this information violated the language of Section 1.A.1, which states that AIA will recommend to IDC future revisions of the Plan. In addition, IDC contends that AIA's failure to disclose the reinsurer's determination that the Plan was an MEWA violated its duty to recommend termination of the Agreement. Section 12.A of the 1996 Agreement provides in relevant part: "If ... the existing law is interpreted to prohibit the continuance of this Agreement, the Agreement shall terminate on the date required by such law or interpretation." Compl. Ex. A, § 12.A. Therefore, IDC argues that when the reinsurer alerted AIA of its belief that the Plan was an MEWA, AIA had a duty to terminate the Agreement. AIA, however, proposed amendments to the 1996 Agreement and Plan documents, which purported to disclaim its prior representations and those of its agent, Henry. Compl. ¶ 44.

The 1996 Agreement also established AIA as the third-party administrator of the Plan. As such, AIA was responsible for making and submitting cost projections of Plan benefit payments and administrative costs pursuant to Sections 1.A.2 and 1.B.1(a) and (c), which provide as follows: "The Administrator [AIA] shall provide I.D.C. with the following services as required for the administration and operation of the Plan.... A. 2. Cost projections of benefit and administration.... B. 1. Preparations of such accounting reports as are needed in the financial management and administrative control of the plan, such as: a. projections of initial and renewal unit cost and total cost; ... c. esti-

---

**3.** The 1996 Agreement was to be automatically renewed for successive twelve-month periods, unless terminated by either party after 31 days' notice. Compl. Ex. A, § 7.

mates of incurred but unpaid claim liabilities." Compl. Ex. A., §§ 1.A.2 and 1.B.1(a) and (c).

In April of 1997, AIA became aware that the funding levels of the Plan were insufficient and that IDC would need to make large assessments to cover the impending shortfalls. Compl. ¶ 55. In June of 1997, AIA warned IDC of an $80,000 funding shortfall; however, by August of 1997, the actual shortfall exceeded $800,000. The Plan was financially unsustainable. *Id.* ¶¶ 56–61. IDC also alleges that AIA, in anticipation of IDC's discovery of the Plan's legal and financial deficiencies, stopped processing claims, but continued to collect administrative fees for work not performed. *Id.* ¶ 62.

IDC terminated its benefit plan as of December 31, 1997, because the regulatory and structural burden imposed upon an MEWA with member-employers in multiple states was prohibitively expensive and impractical. Pl.'s Resp. to Def.'s Mot. for Summ. J., or in the alternative, to Dismiss at 4. As a result of AIA's alleged fraudulent misrepresentations and breaches of contract, IDC incurred $1,000,000 in compliance, termination, and litigation expenses, above the cost of providing insurance to plan members. Compl. ¶¶ 29, 30, 49–51. IDC filed its Complaint in this court on August 29, 2001.

*Legal Analysis*

*Motion to Dismiss Standard*

AIA moves to dismiss this action, arguing that IDC's Indiana state law claims of fraud and breach of contract are preempted by ERISA, or in the alternative, that IDC alleges facts insufficient to state a claim of fraud and breach of contract. A pleading is sufficient if it contains (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Fed.R.Civ.P. 8(a); *South Austin Coalition Cmty. Council v. SBC Communications Inc.,* 274 F.3d 1168,1171 (7th Cir.2001). These statements must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Such notice pleading "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). In evaluating the motion to dismiss, we treat all well-pleaded factual allegations as true, and we construe all inferences that reasonably may be drawn from those facts in a light most favorable to the nonmoving party. Fed.R.Civ.P. 12(b)(6); *Szumny v. Am. Gen. Fin.,* 246 F.3d 1065, 1067 (7th Cir.2001). In addition, the burden rests upon AIA as the moving party to show that the plaintiff cannot prove any facts that would support his claim for relief. *Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 452 (7th Cir.1998); *Gustafson v. Jones,* 117 F.3d 1015, 1017 (7th Cir.1997).

*ERISA Preemption*

IDC has framed its claims as common law fraud and breach of contract. AIA does not allege ERISA preemption as a basis for federal jurisdiction,[4] but rather as a defense to suit. Therefore, we analyze this case as one of "conflict" preemption. Conflict preemption exists when "it is impossible for a private party to comply

4. This court has jurisdiction over this case based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

with both state and federal law and where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372–73, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (internal quotations and citations omitted).

■■■ ERISA's preemption clause provides, with certain exceptions not relevant here, that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). A law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). The broad "connection with" language in *Shaw* is not usually interpreted literally, however. The Supreme Court, in *New York Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), cautioned lower courts to evaluate allegations of preemption with "the starting presumption that Congress does not intend to supplant state law." *Id.* at 654–55, 115 S.Ct. 1671. "[F]or purposes of § 1144(a), a federal court's evaluation of a state law's relation to an employee benefit plan must 'go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.'" *Id.* at 656, 115 S.Ct. 1671. In *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.,* 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997), the Supreme Court amended the "objectives" principle stated in *Travelers,* rephrasing it to stress that the objectives of ERISA are also to be used to determine the "nature of the effect of the state law on ERISA plans." *Id.* at 325, 117 S.Ct. 832.

■■■ ERISA's statutory objectives protect the interests of participants and their beneficiaries by: (1) requiring the disclosure and reporting ... of financial and other information; (2) establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans; (3) providing for appropriate remedies, sanctions, and ready access to the Federal courts; and (4) improving the equitable character and the soundness of plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and to acquire plan termination insurance. 29 U.S.C. §§ 1001(b)-(c). In addition, when Congress enacted § 1144(a), it intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law. Its goal was to minimize the administrative and financial burden of complying with conflicting directives among states or between states and the federal government and to prevent the potential for conflict in substantive law, which would require the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction. *Trustees of AFTRA Health Fund v. Biondi,* 303 F.3d 765, 774–75 (7th Cir.2002) (citing *Travelers,* 514 U.S. at 656–57, 115 S.Ct. 1671).

"Under this rubric, the Supreme Court has identified at least three instances where a state law can be said to have a 'connection with' or 'reference to' employee benefit plans, when it (1) 'mandate[s] employee benefit structures or their administration;' (2) binds employers or plan administrators to particular choices or precludes uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself; and (3) provides an alternative enforcement mechanism to

ERISA." *Biondi,* 303 F.3d at 775 (internal citations omitted). With the foregoing in mind, we turn to AIA's argument that ERISA preempts IDC's state law claims.

■ We note that IDC's claims of common law fraud and breach of contract involve traditional areas of state regulation, and therefore that AIA bears "the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'" *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund,* 520 U.S. 806, 814, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997). However, as AIA argues, the mere fact that States have traditionally regulated common law fraud and breach of contract does not, in and of itself, preclude AIA's claim from being preempted by § 1144(a), if allowing the claim to go forward would thwart the statutory objectives of ERISA. *See, e.g., Dillingham,* 519 U.S. at 330, 117 S.Ct. 832. AIA cites *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), for the proposition that ERISA may preempt even those state laws that are not specifically designed to affect employee benefit plans and those that affect plans only indirectly. *Id.* at 139, 111 S.Ct. 478. In *Ingersoll–Rand,* however, the Court specifically noted that it was not dealing, as we are here, "with a generally applicable [law] that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan." 498 U.S. at 139, 111 S.Ct. 478.

*Fraud in the Inducement*

■ In Count I of the Complaint, IDC contends that AIA defrauded it in the context of a contractual relationship and seeks to recoup monies that it expended unnecessarily as a result of AIA's fraudulent misrepresentations. To state a claim for fraud, IDC must allege that: (1) AIA made a material representation of past or existing fact, (2) the material representation was untrue and known to be untrue, or else recklessly made, (3) IDC did, in fact, rely on the representation, and (4) the representation proximately caused it to suffer injury. *Circle Ctr. Dev. Co. v. Y/G Ind., L.P.,* 762 N.E.2d 176, 179 (Ind.App. 2002). IDC argues with particularity[5] that AIA, in order to induce IDC to adopt the proposed plan and to hire AIA to administer the proposed plan, informed IDC through its agent, Henry, that the legal department of the reinsurer chosen by AIA to provide stop-loss coverage for the proposed plan indicated to AIA that the proposed plan was not an MEWA. (On October 20, 1995, Henry, as AIA's representative, presented the benefits of AIA's proposed plan to IDC.) IDC adopted the proposed plan under the assumption that it would not be subject to the myriad state regulations applicable to MEWAs. Despite AIA's alleged representations, however, the proposed plan was determined to be an MEWA, and IDC allegedly incurred $1,000,000 in compliance, termination, and litigation expenses, above the cost of providing insurance to plan members.

---

**5.** Federal Rule of Civil Procedure 9(b) provides: "In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." In the Seventh Circuit, a plaintiff may satisfy Rule 9(b) by providing a "general outline" of the circumstances constituting the alleged fraud, sufficient to "reasonably notify the defendant[ ] of [its] purported role" in the fraud. *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir.1992). Generally, this outline must include "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992) (citations omitted); *see also General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir.1997). We find that IDC has satisfied these requirements.

■ As just described, a common law fraud claim does not mandate employee benefit structures or their administration, bind employers or plan administrators to particular choices, or preclude uniform administrative practice. With regard to whether it provides an alternative enforcement mechanism to ERISA, we conclude, per *Biondi*, that it does not. The two categories of state laws that the Supreme Court has identified as acting as alternative enforcement mechanisms to ERISA are those in which "the existence of a pension plan is a critical element of a state-law cause of action," and those in which "a state statute contains provisions that expressly refer to ERISA or ERISA plans." *Biondi*, 303 F.3d at 776. By contrast, Indiana's common law tort of fraud in the inducement, a traditional state law of general applicability, clearly makes no direct reference to ERISA plans nor relies on the existence of such plans to operate. *See, e.g., LeBlanc v. Cahill*, 153 F.3d 134, 147–48 (4th Cir.1998).

In addition, the misrepresentations allegedly made by AIA occurred during pre-plan negotiations, and therefore could not have had any impact on the Plan's administration or payment of benefits. *All Risks, Ltd. v. Equitable Life Assurance Soc. of the U.S.*, 931 F.Supp. 409 (D.Md. 1996) (holding that claims based on misrepresentations made by an insurer to an employer regarding the creation and maintenance of a 401(k) Profit Sharing Plan and Trust will in "no way affect the administration of the plan or subject the plan to conflicting regulations which will destroy the uniform administration of the plan"); *see also Biondi*, 303 F.3d at 779–81 (*quoting Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18, 22–23 (2d Cir.1996), "The plaintiffs' fraud claim does not rely on the pension plan's operation or management. . . . The plan was only the context in which this garden variety fraud occurred.").

■ AIA cites *Hall v. Blue Cross/Blue Shield of Ala.*, 134 F.3d 1063, 1064–65 (11th Cir.1998) in support of its argument that "no court will be able to determine whether [plaintiff] has been fraudulently induced without resorting to the written policy and assessing the truth of the agents' representations." However, *Hall* is distinguishable from the present case. First, *Hall* involved a suit by a plan participant against an ERISA plan for denial of benefits. The determination of a participant's rights under a plan is a core concern of ERISA. No such core concern of ERISA is involved here, however. The fraud claim of IDC, the plan sponsor/administrator, against AIA, the third-party administrator, does not involve administrative claims processing or AIA's responsibilities to the Plan or its participants. Instead, IDC's claims relate solely to AIA's duties to IDC under the 1996 Agreement. *See Geweke Ford v. St. Joseph's Omni Preferred Care Inc.*, 130 F.3d 1355, 1360 (9th Cir.1997) (*citing Union Health Care, Inc. v. John Alden Life Ins. Co.*, 908 F.Supp. 429, 435–36 (S.D.Miss.1995)). In addition, unlike the *Hall* court, we are not faced with deciding the truth of AIA's alleged representations, i.e., the question of whether the Plan was an MEWA. We assume for the purposes of AIA's motion that the Plan is an MEWA. Compl. ¶ 21. Therefore, we conclude that IDC has stated a claim for fraud in the inducement against AIA, and that the claim is not preempted by ERISA. Accordingly, AIA's motion to dismiss Count I of the Complaint is *DENIED*.

### Breach of Contract

■ To state a claim for breach of contract in Indiana, one must allege the existence of a contract, the defendant's breach thereof, and damages. *Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 920 (Ind.Ct.App.2002); *Fairfield Dev., Inc. v.*

*Georgetown Woods Senior Apartments Ltd. P'ship*, 768 N.E.2d 463, 473 (Ind.Ct. App.2002). Further, "damages must be the natural and proximate consequences of the breach of contract and cannot be remote or speculative." *Nationwide Mut. Ins. Co. v. Pomeroy*, 141 Ind.App. 288, 227 N.E.2d 448, 449 (1967). In Counts II–V of the Complaint, IDC contends that AIA failed to fulfill the following responsibilities under the 1996 Agreement: (1) to recommend a feasible plan design (i.e., one that would not qualify as an MEWA); (2) to recommend termination of or revisions to the plan (when told by the reinsurer that the Plan was an MEWA); and (3) to report costs accurately to IDC. In addition, IDC contends that, due to AIA's breaches of the 1996 Agreement, it suffered damages of over $1,000,000 in implementation, operation, and termination expenses. As just described, these breach of contract claims do not fall within the three areas of ERISA preemption described in *Travelers*; they do not impact plan structures or administration, affect the calculation of benefits, or interfere with ERISA's enforcement provisions.[6]

The contract at issue in this case is the 1996 Agreement between IDC and AIA, not the Plan. Although the contract and IDC's Complaint may mention the Plan and its provisions, § 1144(a) does not expressly preempt a state law claim merely because it requires a cursory examination of ERISA plan provisions. *See, e.g., Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1472 (4th Cir.1996). The Seventh Circuit has held that "ERISA preempts a state law claim if the claim requires the court to interpret or apply the terms of an employee benefit plan." *See, e.g., Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir.1998). Although AIA posits that the Agreement is "inextricably intertwined" with the Plan, it has not demonstrated how IDC's common law contract claims would require us to interpret or apply any of the Plan's terms. IDC makes no claim based on any right under the Plan. IDC does not contend that any of the Plan's terms have been breached; nor does it seek to enforce or modify the terms of the Plan. *See Airparts Co., Inc. v. Custom Benefit Servs. of Austin, Inc.*, 28 F.3d 1062, 1066 (10th Cir.1994);[7] *see also Cen-*

6. AIA's duty to report costs accurately to IDC is founded in the 1996 Agreement, and as such, does not impact administrative claims processing or AIA's responsibilities to Plan participants. However, to the extent that IDC alleges in Count V that AIA, in anticipation of IDC's discovery of the Plan's legal and financial deficiencies, stopped processing claims, but continued to collect administrative fees for work not performed, such a claim is preempted by ERISA. *See, e.g., Tri–State Machine, Inc. v. Nationwide Life Ins. Co.*, 33 F.3d 309, 313–14 (4th Cir.1994) (concluding that complaints about the processing of claims under an employee benefit plan "relate to" the plan in the common sense meaning of that phrase).

7. In *Airparts*, the Tenth Circuit concluded that ERISA did not preempt claims against third-party service providers. *Id.* at 1066–67. The defendant in that case, like AIA, was an out-

side consultant hired to advise the plan trustees on a plan design. As well, it, like AIA, was not a plan administrator, as that term is defined by ERISA. The Tenth Circuit supported its holding in *Airparts* with the finding that the defendant was not a fiduciary of the plan, and thus, that the case would not affect the relationships among the principal ERISA entities. We are unwilling to make a finding with regard to AIA's status as a fiduciary at this time because the parties did not brief the issue as part of their preemption analysis. Nevertheless, the facts of our case would seem to track the Tenth Circuit's analysis because the 1996 Agreement appears to place on IDC, the plan sponsor, alone all responsibility for plan interpretation, determination of eligibility of claims, and payment of plan benefits. Compl., Ex. A, §§ 2, 3.A.1, 6.B; *see also Fox, Curtis & Assoc., Inc.*, 1993 WL 265474 at *6.

*tral Laborers Welfare Fund v. Philip Morris, Inc.*, 85 F.Supp.2d 875, 891 (S.D.Ill. 1998) (holding that trustees' claims could be resolved without an interpretation of the employee benefit plan where "[t]he meaning of the subrogation clause is not at issue ... [and] the Plaintiffs are attempting to recover monies ... expended for plan participants' or beneficiaries' health care ... [not] monies on behalf of the plan participants or beneficiaries"); *Fox, Curtis & Assoc., Inc. v. Employee Benefit Plans, Inc.*, No. 92 C 5828, 1993 WL 265474 *6 (N.D.Ill. Jul.13, 1993) (claim against third-party administrator and stop-loss insurer alleging breach of contract not preempted since "any effect that Defendants' breach of their obligations may have on plan beneficiaries is incidental to [employer's] claims"); *contrast Miller v. Lay Trucking Co., Inc.*, 606 F.Supp. 1326, 1333 (N.D.Ind. 1985) (finding preempted a breach of contract claim that goes to the terms of the pension plan itself).

For the reasons explicated above, we conclude that in Counts II–V of the Complaint, IDC has stated breach of contract claims against AIA, and that they, as modified by footnote 6, are not preempted by ERISA. Accordingly, AIA's motion to dismiss Counts II–V of the Complaint is *DENIED*.

### Conclusion

Defendant AIA moved to dismiss this action, arguing that IDC's Indiana state law claims of fraud and breach of contract are preempted by ERISA, or in the alternative, that IDC alleges facts insufficient to state a claim of fraud and breach of contract. For the reasons explained above, we find that IDC has stated claims for fraud with respect to Count I and for breach of contract with respect to Counts II–V. As well, we conclude that those claims are not preempted by ERISA. For the reasons discussed in footnote 6, however, we exclude from our determinations any cause of action resulting from improper processing of claims. Accordingly, AIA's Motion to Dismiss Plaintiff's Complaint is *DENIED*.